UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

ALEXANDRA AXON, on behalf of herself and all others similarly situated,

Plaintiff,

v.

CITRUS WORLD, INC. and FLORIDA'S NATURAL GROWERS, INC.,

Defendants.

18-cv-4162 (ARR) (RML)

**Opinion & Order**

ROSS, United States District Judge:

On July 20, 2018, Alexandra Axon ("Axon" or "plaintiff") filed a putative class action complaint against Florida's Natural Growers, Inc. and its parent company, Citrus World, Inc. (collectively, "Florida's Natural" or "defendant"). Florida's Natural sells a variety of orange juice products ("products") that contain trace amounts of glyphosate, an herbicide used to kill weeds. Plaintiff alleges that the use of the term "natural" in defendant's brand name is deceptive because glyphosate is not a natural ingredient. Plaintiff brings putative class claims under New York's consumer protection statute on behalf of herself and other New York purchasers. Plaintiff also brings putative common law class claims under the laws of all states on behalf of herself and a putative nationwide class of purchasers. Before the court is defendant's motion to dismiss plaintiff's complaint for lack of subject matter jurisdiction, pursuant to Federal Rule of Civil Procedure 12(b)(1), and for failure to state a claim, pursuant to Rule 12(b)(6). Because plaintiff fails to assert a plausible claim, defendant's motion to dismiss under Rule 12(b)(6) is granted.

1

**FACTUAL AND PROCEDURAL BACKGROUND**

Defendant is a "leading producer of premium orange juice." *See* Compl. ¶ 15, ECF No. 1. Defendant's products bear the company's brand name, "Florida's Natural." *See id.* ¶¶ 1(a)–(e), 15. Axon, a citizen of New York, "regularly purchased" Florida's Natural orange juice at a Key Food store located in Brooklyn. *Id.* ¶¶ 8, 12. Axon alleges that, in making these purchases, she relied on the statement that the product was "natural." *See id.* ¶ 12.

Glyphosate is an herbicide used to kill weeds. *Id.* ¶¶ 2, 27. It is created by artificially replacing one of the hydrogen atoms in the amino acid glycine with a phosphonomethyl group. *Id.* ¶¶ 28–29. Thus, plaintiff argues, glyphosate is an "[un]natural" "synthetic biocide." *Id.* ¶¶ 2–3, 30. According to laboratory tests conducted on defendant's products, they contain glyphosate levels of 5.11 nanograms per milliliter. *Id.* ¶ 26.[1] Because defendant's products contain glyphosate, plaintiff contends that its use of the word "natural" is false and misleading. *See, e.g.*, *id.* ¶¶ 12, 33, 37–39. She alleges that "[r]easonable consumers do not expect glyphosate to be found in truly natural orange juice," *id.* ¶ 33, and that she "would not have purchased, or would not have paid a premium for, [defendant's] Products had Florida's Natural not misrepresented the process by which their orange juice is made," *id.* ¶ 13.[2]

---

[1] Defendant notes that this level of glyphosate is "approximately 1/100th of the tolerance expressly allowed by the [U.S. Food and Drug Administration] and determined to be safe by the Environmental Protection Agency." Mem. of Law in Supp. Def.'s Mot. to Dismiss 1 ("Def.'s Mem. of Law"), ECF No. 18-1. Plaintiff does not contest that the amount of glyphosate in defendant's products are within the federal limits. *See* Pl.'s Mem. of Law in Opp'n Def.'s Mot. to Dismiss 20–21 ("Pl.'s Opp'n"), ECF No. 22.

[2] Plaintiff's complaint suggests that she is also challenging defendant's processing techniques as being "unnatural." *See, e.g.*, Compl. ¶¶ 35–36 ("Florida's Natural also utilizes a combination of deaeration, long-term storage, and flavor enhancement and blending to produce juice that is consistent from batch to batch. No reasonable consumer would view orange juice processed in this way as 'Natural.'"). However, in plaintiff's opposition to defendant's motion to dismiss, she clarifies that her "claim[s] that Defendants' use of the term 'natural' on the Products' labeling is false and misleading . . . . are solely based on the presence of glyphosate in the Products, and not on any other processing of Defendants' products, despite Defendants' assertions to the contrary." Pl.'s Opp'n 17 n.4. In response, defendant requests that the allegations in the complaint referring to processing "be stricken" as "irrelevant and immaterial to this action." Def.'s Reply to Pl.'s Opp'n 5 n.3 ("Def.'s Reply"), ECF No. 23.

The Food and Drug Administration ("FDA") has not promulgated a regulation governing the use of the term "natural" on food labeling. *See* FDA, "Natural" on Food Labeling, U.S. Dep't Health and Human Servs., https://www.fda.gov/Food/GuidanceRegulation/GuidanceDocumentsRegulatoryInformation/LabelingNutrition/ucm456090.htm (last updated Oct. 22, 2018) ("FDA Notice Update") ("[T]he FDA has not engaged in rulemaking to establish a formal definition of the term 'natural.'"). In 2015, however, the FDA "announc[ed] the establishment of a docket to receive information and comments on the use of the term 'natural' in the labeling of human food products," including comments on whether the FDA "[s]hould . . . define, through rulemaking, the term 'natural.'" Use of the Term "Natural" in the Labeling of Human Food Products; Request for Information and Comments, 80 Fed. Reg. 69,905, 69,905, 69,908 (Nov. 12, 2015) ("FDA Notice"). The comment period closed on May 10, 2016. *See* FDA Notice Update. While the FDA has not yet defined the term "natural," it does have a "longstanding policy" regarding the use of the term on food labels. *See* FDA Notice, 80 Fed. Reg. at 69,906 (noting that the FDA has interpreted the term "natural" to mean that "nothing artificial or synthetic . . . has been added to[] a food that would not normally be expected to be in the food," but that this policy "was not intended to address food production methods, such as the use of genetic engineering or . . . the use of

---

Under Federal Rule of Civil Procedure 12(f), "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." The court has the discretion to consider a motion to strike at any time. *See, e.g.*, *Wine Markets Int'l, Inc. v. Bass*, 177 F.R.D. 128, 133 (E.D.N.Y. 1998). However, motions to strike are "generally 'disfavored and granted only if there is a strong reason to do so.'" *Walters v. T&D Towing Corp.*, No. 17-CV-0681 (JS) (AKT), 2018 WL 1525696, at *2 (E.D.N.Y. Mar. 28, 2018) (quoting *Spiteri v. Russo*, No. 12-CV-2780, 2013 WL 4806960, at *64 n.62 (E.D.N.Y. Sept. 7, 2013)). Motions to strike are frequently denied as moot when the presiding judge does not rely on the material the moving party seeks to strike. *See Snyder v. Perry*, No. 14–CV–2090 (CBA)(RER), 2015 WL 1262591, at *13 (E.D.N.Y. Mar. 18, 2015) (citing cases). In light of plaintiff's clarification that her claims are based solely on the presence of glyphosate in defendant's products, I did not consider the portions of her complaint about processing, and defendant's motion to strike is therefore denied as moot. Defendant also requests that plaintiff's allegations about the safety of glyphosate be stricken from the complaint. *See* Def.'s Mem. of Law 14–15. However, because I did not rely on those portions of the complaint in rendering my opinion, this request is likewise denied as moot.

pesticides" (quoting Food Labeling: Nutrient Content Claims, General Principles, Petitions, Definition of Terms; Definitions of Nutrient Content Claims for the Fat, Fatty Acid, and Cholesterol Content of Food, 58 Fed. Reg. 2302, 2407 (Jan. 6, 1993) (to be codified at 21 C.F.R. pts. 5, 101))).[3]

The complaint in this action was filed on July 20, 2018. *See* Compl. at 18. Axon is the only plaintiff identified by name, but Axon purports to represent a nationwide class of all consumers who purchased Florida's Natural products, as well as a sub-class of all New York residents who purchased those products. *See id.* ¶ 41. Plaintiff alleges four causes of action against Florida's Natural: (1) violation of New York General Business Law § 349 ("NYGBL § 349") for deceptive practices (on behalf of the New York sub-class); (2) violation of New York General Business Law § 350 ("NYGBL § 350") for false advertising (on behalf of the New York sub-class); (3) breach of express warranty (on behalf of the nationwide class); and (4) unjust enrichment (on behalf of the nationwide class). *See id.* at 11–17.

On August 20, 2018, Florida's Natural requested a pre-motion conference to obtain permission to file a motion to dismiss plaintiff's complaint. *See* Def.'s Pre-Motion Letter, ECF No. 16. On August 29, 2018, plaintiff submitted an opposition to defendant's request. *See* Pl.'s Opp'n Def.'s Pre-Motion Letter, ECF No. 17. After reviewing the parties' letters, I determined

---

[3] In *Wong v. Newman's Own, Inc.*, a case previously before me in which plaintiff challenged defendant's use of the term "natural" as false and misleading, I granted a stay of the proceedings under the primary jurisdiction doctrine based on the FDA's November 2015 solicitation. *See* Opinion and Order at *11–15, *Wong*, No. 16-cv-6690 (ARR) (RML) (E.D.N.Y. Apr. 7, 2017), ECF No. 19. Unlike in *Wong*, neither party in this matter has requested a stay. For this reason, and because Axon's claims fail as a matter of law, I find that a stay under the primary jurisdiction doctrine is not appropriate. *See In re Gen. Mills Glyphosate Litig.*, No. 16-2869 (MJD/BRT), 2017 WL 2983877, at *5 (D. Minn. July 12, 2017) (declining to address defendant's primary jurisdiction argument "because, regardless of whether and how the FDA does decide to take up the definition of the term 'natural,' which it has so far declined to do, the particular claims in this case are simply not plausible"); *see also Podpeskar v. Dannon Co.*, No. 16-cv-8478 (KBF), 2017 WL 6001845, at *4 n.3 (S.D.N.Y. Dec. 3, 2017) (finding a stay unnecessary even though "many courts in this district have stayed similar actions pending the upcoming FDA regulations on the word 'natural,'" because "there is ample basis for dismissal regardless of any new FDA rules"). I note also that courts in the Second Circuit have recently declined to apply the primary jurisdiction doctrine in "natural" cases. *See, e.g., Petrosino v. Stearn's Prods.*, No. 16-CV-7735 (NSR), 2018 U.S. Dist. LEXIS 55818, at *27–32 (S.D.N.Y. Mar. 30, 2018).

that a pre-motion conference was not necessary and authorized defendant to bring its motion in support of dismissal. *See* Notice (Other) (Aug. 31, 2018). On September 21, 2018, defendant moved to dismiss under Rule 12(b)(1) on the basis that plaintiff lacks standing to bring her purported causes of action, and under Rule 12(b)(6) on the basis that plaintiff has failed to state a claim upon which relief can be granted. *See* Notice of Def.'s Mot. to Dismiss, ECF No. 18; Def.'s Mem. of Law. Plaintiff opposes defendant's motion. *See* Pl.'s Opp'n.

## DISCUSSION

Defendant moves to dismiss the complaint for lack of standing and failure to state a claim. For the following reasons, defendant's motion to dismiss plaintiff's claims on standing grounds is denied, and the motion to dismiss for failure to state a claim is granted.

### I. **Defendant's motion to dismiss plaintiff's claims on standing grounds is denied.**

Each plaintiff invoking the jurisdiction of the federal courts must demonstrate that she has standing under Article III "for each claim [s]he seeks to press." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). "To satisfy the 'irreducible constitutional minimum' of Article III standing, a plaintiff must demonstrate (1) 'injury in fact,' (2) a 'causal connection' between that injury and the complained-of conduct, and (3) a likelihood 'that the injury will be redressed by a favorable decision.'" *Strubel v. Comenity Bank*, 842 F.3d 181, 187–88 (2d Cir. 2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). "If plaintiffs lack Article III standing, a court has no subject matter jurisdiction to hear their claim." *Mahon v. Ticor Title Ins. Co.*, 683 F.3d 59, 62 (2d Cir. 2012) (quoting *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 433 F.3d 181, 198 (2d Cir. 2005)). "The plaintiff bears the burden of 'alleg[ing] facts that affirmatively and plausibly suggest that it has standing to sue.'" *Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.à.r.l.*, 790 F.3d 411, 417 (2d Cir.

2015) (alteration in original) (quoting *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011)). "In assessing the plaintiff's assertion of standing, '[I] accept as true all material allegations of the complaint and construe the complaint in favor of the [plaintiff].'" *Id.* (original alterations omitted) (quoting *W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*, 549 F.3d 100, 106 (2d Cir. 2008)).

Defendant first claims that plaintiff lacks Article III standing because she has not suffered any injury as a result of defendant's alleged wrongdoing. *See* Def.'s Mem. of Law 23–26. Plaintiff contends that she has suffered an economic injury because "she purchased the products at a price premium based on [defendant's] misleading labeling." Pl.'s Opp'n 33. A plaintiff's allegation that she purchased products bearing misleading labels and sustained financial injury as a result is sufficient to give that plaintiff Article III standing. *See, e.g.*, *In re Frito-Lay N. Am., Inc All Nat. Litig.*, No. 12–MD–2413 (RRM)(RLM), 2013 WL 4647512, at *11 (E.D.N.Y. Aug. 29, 2013). Thus, plaintiff has Article III standing.

Defendant also argues that plaintiff lacks statutory standing to bring her NYGBL claims. *See* Def.'s Reply 14–15. "For statutory standing, 'the question is whether the plaintiff has a cause of action under the statute.'" *Robainas v. Metro. Life Ins. Co.*, No. 14cv9926 (DLC), 2015 WL 5918200 (S.D.N.Y. Oct. 9, 2015) (quoting *Chabad Lubavitch of Litchfield Cnty., Inc. v. Litchfield Historic Dist. Comm'n*, 768 F.3d 183, 201 (2d Cir.2014)). Defendant alleges that under the NYGBL, simply purchasing a product is insufficient to support a cause of action for deceptive practices. *See* Def.'s Reply 14–15.[4] While New York courts have held that "allegations

---

[4] While defendant's challenge to plaintiff's statutory standing focuses on NYGBL § 349 (deceptive practices), the standing analysis is the same under § 350 (false advertising). *See, e.g.*, *Baker-Rhett v. Aspiro AB*, 324 F. Supp. 3d 407, 416 (S.D.N.Y. 2018) ("To establish a claim under either Section 349 or Section 350, 'a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice.'" (quoting *City of New York v. Smokes-Spirits.Com, Inc.*, 911 N.E.2d 834, 838 (N.Y. 2009)).

of pecuniary loss arising solely from the purchase of the defendant's product [do not] suffice to plead 'actual injury' for a Section 349 claim," *Preira v. Bancorp Bank*, 885 F. Supp. 2d 672, 676 (S.D.N.Y. 2012), a plaintiff who claims that "the price of the product was inflated as a result of defendant's deception" does meet the injury requirement, *id.* at 677 (citation omitted); *see also Segedie v. Hain Celestial Grp., Inc.*, No. 14-cv-5029 (NSR), 2015 WL 2168374, at *12 (S.D.N.Y. May 7, 2015) ("Plaintiffs have . . . adequately alleged injury [under NYGBL §§ 349 and 350] by claiming that they paid a price premium that they would not have paid if the products were not labeled 'natural' or 'all natural.'"). According to defendant, plaintiff has not adequately alleged injury because she has failed to demonstrate that she paid a premium for defendant's products. *See* Def.'s Reply 14–15. However, "while identifying the prices of competing products in the [c]omplaint would strengthen [p]laintiff's allegation of injury, the failure to do so is not fatal to [her] claim." *Goldemberg v. Johnson & Johnson Consumer Cos.*, 8 F. Supp. 3d 467, 481–82 (S.D.N.Y. 2014) (internal citations omitted) (citing cases that have found NYGBL § 349 claims valid despite plaintiffs not identifying competitors or prices). Thus, plaintiff's unsupported assertion that she paid a premium for defendant's products is sufficient to give her statutory standing.

Defendant further alleges that plaintiff lacks standing to bring a claim for injunctive relief. *See* Def.'s Mem. of Law. 26–28; Def.'s Reply 16–17. Under Supreme Court and Second Circuit precedent, "[p]laintiffs lack standing to pursue injunctive relief where they are unable to establish a 'real or immediate threat' of [future] injury." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 239 (2d Cir. 2016) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 111–12 (1983) and *Shain v. Ellison*, 356 F.3d 211, 215–16 (2d Cir. 2016)). A plaintiff does not necessarily have standing to seek injunctive relief even when it is clear that she has standing to seek damages. *See*

*Lyons*, 461 U.S. at 105–06; *Nicosia*, 834 F.3d at 239. "[P]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *Lyons*, 461 U.S. at 102 (alteration in original) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974)). Florida's Natural claims that because Axon "is [admittedly] aware of the purported misrepresentations . . . she is not likely to be injured by [defendant's] alleged conduct in the future." Def.'s Mem. of Law. 26–27. Plaintiff asserts that if defendant's misleading labels were fixed, she "would consider purchasing the Products again." *See* Compl. ¶ 14. Thus, she argues, she has standing to sue for injunctive relief because she is "being injured on an ongoing basis[] through her inability to trust the labels on the Products," and she cannot be sure that defendant's products are truthfully labeled without an order from this court. Pl.'s Opp'n 36. "The question of whether a Plaintiff seeking injunctive relief for consumer deception 'will be able to demonstrate standing where, as here, [she] allege[s] [she] would buy the products in the future if not mislabeled' is . . . unsettled in [the Second] Circuit." *Petrosino*, 2018 U.S. Dist. LEXIS 55818, at *10 (quoting *Podpeskar*, 2017 WL 6001845, at *4 n.2). Because I find that plaintiff has standing to bring her claims under a damages theory, and that these claims fail as a matter of law, I need not decide whether she has standing to seek injunctive relief.[5]

## II. Defendant's motion to dismiss plaintiff's claims for failure to state a claim is granted.

On a motion to dismiss under Rule 12(b)(6), the court must accept all factual allegations in the complaint as true and must draw all reasonable inferences in favor of the non-moving

---

[5] For the same reasons, I do not address whether plaintiff has class standing. *See, e.g.*, *Petrosino*, 2018 U.S. Dist. LEXIS 55818, at *14 (noting that "there is disagreement as to whether it is appropriate to determine class standing at the motion to dismiss stage").

party. *See Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 113 (2d Cir. 2013). In deciding defendant's motion to dismiss, the court must therefore accept the facts alleged in plaintiff's complaint as true. The complaint's allegations "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Only "a plausible claim for relief survives a motion to dismiss." *LaFaro v. N.Y. Cardiothoracic Grp.*, 570 F.3d 471, 476 (2d Cir. 2009). Thus, courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

### A. Preemption

Florida's Natural first moves to dismiss plaintiff's complaint on the grounds that her claims are preempted by the Federal Food, Drug, and Cosmetic Act (the "FDCA"). *See* Def.'s Mem. of Law 7–16; Def.'s Reply 3–14. Under the Supremacy Clause, U.S. Const. art. VI, cl. 2, state laws that "interfere with, or are contrary to the laws of Congress, made in pursuance of the constitution" are invalid. *Gibbons v. Ogden*, 22 U.S. 1, 82 (1824); *see also N.Y. SMSA Ltd. P'ship v. Town of Clarkstown*, 612 F.3d 97, 103–04 (2d Cir. 2010). There are three types of preemption: express, conflict, and field. *See N.Y. SMSA Ltd. P'ship*, 612 F.3d at 104. Defendant alleges that express and conflict preemption apply to plaintiff's claims. *See* Def.'s Mem. of Law 8–9. Express preemption occurs when Congress has "expressly preempted local law," while conflict preemption occurs when local and federal laws conflict in such a way that a party cannot comply with both or "the local law is an obstacle to the achievement of federal objectives." *N.Y. SMSA Ltd. P'ship*, 612 F.3d at 104. Because I find that neither theory of preemption bars plaintiff's claims, I decline to dismiss her complaint on preemption grounds.

### i. The FDCA

The FDCA, enacted in 1938, prohibits the misbranding of food and gives the FDA the authority to oversee the safety and labeling of food. *See* 21 U.S.C. § 331(a). In 1990, Congress amended the FDCA by enacting the Nutrition Labeling and Education Act of 1990 (the "NLEA"), in order "to clarify and to strengthen the [FDA's] legal authority to require nutrition labeling on foods, and to establish the circumstances under which claims may be made about nutrients in foods." H.R. Rep. No. 101-538, at 7 (1990), *as reprinted in* 1990 U.S.C.C.A.N. 3336, 3337. The NLEA preempts state laws that impose labeling requirements that are "not identical" to the requirements of the FDCA. 21 U.S.C. § 343-1(a)(2). The FDCA does not require food manufacturers to disclose the presence of glyphosate on their food labels. In fact, the FDA allows trace amounts of herbicides to be present in foods in specified amounts, known as tolerances, without the food being deemed unsafe or adulterated. 21 U.S.C. §§ 346a(a)(1)(A), 346a(a)(4). States are prohibited from imposing different tolerance levels than the ones adopted by the FDA. 21 U.S.C. § 346a(n)(4). For citrus fruit, the allowed tolerance level for glyphosate is 0.50 parts per million. 40 C.F.R. § 180.364(a)(1). As noted previously, it is undisputed that the levels of glyphosate alleged in the complaint fall below this tolerance level. *See supra* n.1.

### ii. Express Preemption

Defendant first argues that plaintiff's claims are expressly preempted because FDA regulations require Florida's Natural to label its orange juice "100 percent juice," *see* Def.'s Mem. of Law 9 (citing 21 C.F.R. § 101.30(i)), and that the FDA allows "100 percent juice" products to be labeled "100 percent natural," *see id.* (citing 21 C.F.R. § 101.30(l)). This is not accurate. The parties do not dispute that defendant is entitled to label its products "100 percent juice." *See* Pl.'s Opp'n 20–21 n.7. However, while 21 C.F.R. § 101.30(l) prohibits products that

contain *less* than 100 percent juice from bearing the label "100 percent natural," it does not grant products permissibly labeled "100 percent juice" permission to declare themselves "100 percent natural." *See* 21 C.F.R. § 101.30(l); Def.'s Mem. of Law 9; Pl.'s Opp'n 21 n.7 ("Significantly, the regulation does not state when a product label may use the term 'natural,' only when it *may not*."). Thus, the FDCA does not expressly permit Florida's Natural to use the term "natural" on its products.

Defendant next argues that plaintiff's claims are expressly preempted because she seeks to impose labeling requirements on defendant regarding the presence of glyphosate that are different from federal law. *See* Def.'s Mem of Law 9–11. However, plaintiff makes clear that she is not seeking such disclosure:

> Plaintiff is not alleging that Defendants' products should not be permitted to contain glyphosate, even though it is permitted under federal law (within specified limits). Plaintiff is not alleging that Defendants must disclose the presence of glyphosate on labels, even though there is no federal requirement for such a disclosure. . . . Rather, Plaintiff is simply alleging that, if Defendants' products contain synthetic substances such as glyphosate, they may not label their products as "natural."

Pl.'s Opp'n 11 (emphasis removed); *see also id.* at 20 n.6. While Florida's Natural contends that plaintiff's position is "contrary to the actual allegations of the Complaint," *see* Def.'s Reply 9; *see also id.* at 7–9, I accept plaintiff's statement that she is not seeking the mandatory disclosure of glyphosate. Defendant's argument for preemption on this ground is therefore denied.[6]

---

[6] Because I assume plaintiff is not seeking the mandatory disclosure of glyphosate, I do not address whether this claim would be preempted under the FDCA. *See, e.g.*, *Organic Consumers Ass'n v. Gen. Mills, Inc.*, No. 2016 CA 6309 B, 2017 D.C. Super. LEXIS 4, at *25 (D.C. Super. Ct. July 6, 2017) (declining to address defendant's argument that a claim requiring disclosure of glyphosate is preempted by federal law, but noting that the argument is "potentially meritorious"); *Parker v. J.M. Smucker Co.*, No. C 13-0690 SC, 2013 WL 4516156, at *4 (N.D. Cal. Aug. 23, 2013) (holding that while "[d]efendant may not affirmatively be required to disclose its use of bioengineered ingredients," plaintiff's claim that defendant's use of the term "natural" might be false and misleading if defendant did in fact use unnatural products was not preempted); *see also Tran v. Sioux Honey Ass'n, Coop.*, No. 8:17-cv-110-JLS-JCGx, 2018 U.S. Dist. LEXIS 146380, at *9 (C.D. Cal. Aug. 20, 2018) (finding against preemption because "the crux of [plaintiff's] claims is [defendant'sl use of the words 'Pure' and '100% Pure' on its product labels, not [defendant's] failure to disclose the presence of glyphosate in its honey").

Defendant relies on *Gibson v. Quaker Oats Co.*, No. 16 CV 4853, 2017 WL 3508724 (N.D. Ill. Aug. 14, 2017) to support its argument that plaintiff's claims are expressly preempted. In *Gibson*, the plaintiffs brought a class action against Quaker Oats alleging that the statement "100% Natural Whole Grain" on product packaging was deceptive because the products contained glyphosate. *Gibson*, 2017 WL 3508724, at *3. The court dismissed plaintiffs' claims on the grounds that "Congress has preempted the field of food labeling [under 21 U.S.C. § 343-1(a)] and . . . the presence of pesticides and chemical residues is governed by [21 U.S.C §§ 346a, 346(n)(4)]." *Id.* at *4. I find *Gibson* distinguishable and unpersuasive. First, unlike Axon, the *Gibson* plaintiffs were seeking disclosure of glyphosate. *See id.* at *3. Second, as plaintiff points out in her opposition brief, the *Gibson* court came to its preemption conclusion by misquoting 21 U.S.C. § 343-1. The *Gibson* court writes: "The statute states 'no State or political subdivision of a State may directly or indirectly establish under any authority or continue in effect as to any food in interstate commerce[.]'" *Gibson*, 2017 WL 3508724, at *4 (alteration in *Gibson*) (quoting 21 U.S.S. § 343-1(a)). In actuality, 21 U.S.C. § 343-1 goes on to state (without a period) that only state requirements "*not identical*" to certain federal requirements are preempted. 21 U.S.C. § 343-1(a)(1)–(5) (emphasis added). Because the FDA has not created a rule for when food products may be labeled "natural," courts have found that plaintiffs' state law claims challenging the use of "natural" as false and misleading are not preempted by the FDCA. *See Silva v. Smucker Nat. Foods, Inc.*, No. 14–CV–6154 (JG)(RML), 2015 WL 5360022, at *5 (E.D.N.Y. Sept. 14, 2015) ("[T]he FDA has not promulgated any formal rule governing when food products may or may not be labeled 'natural' that would have preemptive effect."); *Ault v. J.M. Smucker Co.*, No. 13 Civ. 3409(PAC), 2014 WL 1998235, at *3 (S.D.N.Y. May 15, 2014) (holding that plaintiff's claims should not be preempted "by the FDA's inaction" regarding the

12

use of the term "natural"). Preemption is particularly inappropriate when plaintiffs are simply seeking removal of the term "natural" from defendants' labels. *See Ault*, 2014 WL 1998235, at *3 (finding against preemption because "[e]liminating 'All Natural' has no effect on [d]efendant's ingredient labeling and therefore cannot conflict with FDA labeling requirements"); *Parker*, 2013 WL 4516156, at *4 (holding that plaintiff's claim challenging defendant's use of "natural" as misleading was not preempted by the FDCA because defendant could have removed the term from its labels); *see also Tran*, 2018 U.S. Dist. LEXIS 146380, at *9 (holding the same with respect to defendant's use of the word "pure" on its honey products).[7] Thus, I decline to follow the court's holding in *Gibson*.[8]

### iii. Conflict Preemption

As discussed above, conflict preemption can occur in two circumstances—when it is impossible to comply with both state and federal law, or when local law serves as an obstacle to the accomplishment of federal objectives. *See N.Y. SMSA Ltd. P'ship*, 612 F.3d at 104; *see also Marentette v. Abbott Labs., Inc.*, 201 F. Supp. 3d 374, 379 (E.D.N.Y. 2016). Plaintiff's claims do not make it impossible for Florida's Natural to comply with both state and federal law, because plaintiff is not seeking to enforce any labeling requirements that conflict with federal law, *see supra* Sec. II.A.ii, and because both New York law and the FDCA prohibit food labels that are

---

[7] Defendant attempts to distinguish *Tran* on the grounds that the FDA has adopted tolerance levels for glyphosate in citrus fruit but not honey. *See* Def.'s Reply 11–12. However, the question for preemption purposes is not whether defendants' products contain tolerable levels of glyphosate, but whether any product with glyphosate may be labeled "natural" or "pure."

[8] I note also that in finding in favor of preemption, the *Gibson* court misinterpreted the FDA Notice. *See Gibson*, 2017 WL 3508724, at *4. The court concluded that the FDA Notice's guidance on the use of the term "natural" with respect to pesticides weighed in favor of preemption. *See id.* However, the FDA Notice makes clear that the FDA has explicitly declined to issue such guidance. *See* FDA Notice, 80 Fed Reg. at 69,906 ("[FDA] policy concerning the use of the term 'natural' . . . was not intended to address food production methods, such as . . . the use of pesticides.").

13

"false or misleading in any particular," 21 U.S.C. § 343(a)(1); N.Y. Agric. & Mkts. Law § 201(1) (McKinney 2004).[9] Defendant asserts that plaintiff's claims must be dismissed under conflict preemption because "[her] claims serve as an obstacle to the underlying purposes of the FDCA to create uniform standards and requirements for the labeling, contents, and safety of food products." Def.'s Mem. of Law 12. Defendant bases its argument for conflict preemption on plaintiff's alleged request for disclosure of glyphosate, which would "misleadingly suggest to the public that [defendant's] products are unsafe or unadulterated (contrary to what has been determined by the FDA)." *Id.* at 12–13. Because plaintiff is not requiring disclosure of glyphosate but is rather seeking removal of the term "natural," defendant's argument fails. *See, e.g., Tran*, 2018 U.S. Dist. LEXIS 146380, at *9 (holding that requiring defendant to remove the term "pure" from its product labels "would [not] stand as an obstacle to the accomplishment and execution of the purposes and objectives of Congress" because defendant "could continue to manufacture and sell its honey products with trace amounts of glyphosate, and it could continue to omit disclosing the presence of trace amounts of glyphosate on its product labels"). Thus, plaintiff's claims are not preempted.[10]

---

[9] While New York's Agriculture and Marketing law incorporates the FDCA's labeling provisions forbidding the misbranding of food, plaintiffs receive their private rights of action for the misbranding of food under consumer protection laws such as NYBGL §§ 349 and 350. *See, e.g., Koenig v. Boulder Brands. Inc.*, 995 F. Supp. 2d 274, 280–81 (S.D.N.Y. 2014); *see also Wurtzburger v. Kentucky Fried Chicken*, No. 16-CV-08186 (NSR), 2017 WL 6416296, at *4 (S.D.N.Y. Dec. 13, 2017).

[10] Axon's breach of warranty claim is also not preempted. *See Ackerman v. Coca-Cola Co.*, No. CV–09–0395 (JG)(RML), 2010 WL 2925955, at *24 (E.D.N.Y. July 21, 2010) ("The Supreme Court has held that breach of warranty claims do not impose an additional 'requirement' under state law, because the duty to honor a promise voluntarily undertaken '[can] not fairly be said to be "imposed under state law," but rather is best understood as undertaken by the manufacturer itself,' and are therefore not preempted." (quoting *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 526 (1992))).

Florida's Natural makes an additional argument for dismissal under the safe harbor provisions of the NYGBL, which bar claims for deceptive practices and false advertising when a defendant's behavior complies with federal rules and regulations. *See* N.Y. Gen. Bus. Law §§ 349(d), 350-d (McKinney 2014); *see also In re Frito-Lay*, 2013 WL 4647512, at *21–22. Because Axon is alleging that defendant's use of the term "natural" violates federal law, *see* Pl.'s Opp'n 32 (alleging that defendant's labels are false and misleading in violation of 21 U.S.C. §343(a)(1)), and the FDA has not promulgated a rule that bears on whether products containing glyphosate can be labeled

### B. N.Y. General Business Law Sections 349 and 350

Under NYGBL §§ 349 and 350, "[d]eceptive acts or practices" and "false advertising" are unlawful "in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 349(a) (deceptive acts); *id.* § 350 (false advertising). To survive a motion to dismiss, plaintiff must allege statements that were "likely to mislead a reasonable consumer acting reasonably under the circumstances." *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 647 N.E.2d 741, 745 (N.Y. 1995); *see also Fink v. Time Warner Cable*, 714 F.3d 739, 741 (2d Cir. 2013); *Bowring v. Sapporo U.S.A., Inc.*, 234 F. Supp. 3d 386, 390 (E.D.N.Y. 2017). "[P]laintiffs must do more than plausibly allege that a 'label might conceivably be misunderstood by some few consumers.' Plaintiffs must plausibly allege 'that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled.'" *Jessani v. Monini N. Am., Inc.*, No. 17-2504-cv, 2018 WL 6287994, at *1 (2d Cir. Dec. 3, 2018) (summary order) (internal citations omitted) (quoting *Ebner v. Fresh, Inc.*, 838 F.3d 958, 965 (9th Cir. 2016)). This is an objective inquiry. *Cohen v. JP Morgan Chase & Co.*, 498 F.3d 111, 126 (2d Cir. 2007). Here, plaintiff alleges that "[r]easonable consumers do not expect glyphosate to be found in truly natural orange juice," Compl. ¶ 33, and that "[r]easonable consumers would be misled by the Products' labeling," *id.* ¶ 62. While the question of whether a reasonable consumer would be deceived by a "natural" label is not typically resolved at the motion to dismiss stage, *see, e.g.*, *Buonasera v. Honest Co.*, 208 F. Supp. 3d 555, 567 (S.D.N.Y. 2016), dismissal is appropriate when the complaint fails to allege facts that state a plausible claim for relief, *see In re Gen. Mills*, 2017 WL 2983877, at *6 (citing cases); *see also Podpeskar*,

---

"natural" without being false or misleading, the safe harbor doctrine does not apply. *See In re Frito-Lay*, 2013 WL 4647512, at *22 (finding that the FDA's unclear rules regarding the use of "natural" on product labels precluded defendant from receiving NYGBL safe harbor protections).

2017 WL 6001845, at *3. Because the court concludes that it is not plausible to allege that a reasonable consumer would interpret the brand label "Florida's Natural" as meaning that the product contains no traces of glyphosate, plaintiff's NYGBL claims are dismissed.

In coming to this conclusion, I find the reasoning in *In re General Mills* persuasive. There, plaintiffs brought a consolidated class action complaint[11] against General Mills alleging that the company misleadingly labeled its Nature Valley products as "Made with 100% Natural Whole Grain Oats" when the products contain trace amounts of glyphosate. *In re Gen. Mills*, 2017 WL 2983877, at *1. Like Axon, the plaintiffs alleged that "glyphosate is not 'natural,' but rather is an 'unnatural' 'synthetic biocide.'" *Id.* In dismissing plaintiffs' claims for failure to state a claim, the court noted that "[i]t would be nearly impossible to produce a processed food with no trace of any synthetic molecule." *Id.* at *6. Regardless of whether this is true, plaintiff herself admits that glyphosate is "frequently used to kill weeds." Compl. ¶ 2; *see also Gibson*, 2017 WL 3508724, at *1 (noting that "[g]lyphosate is the most prevalent herbicide in the world"). Given the widespread use of herbicides, the court finds it "implausible that a reasonable consumer would believe that a product labeled ['Florida's Natural'] could not contain a trace amount of glyphosate that is far below the amount" deemed tolerable by the FDA. *In re Gen. Mills*, 2017 WL 2983877, at *5.

Plaintiff's claims are distinguishable from the majority of "natural" claims in which courts have denied defendants' motions to dismiss. *See* Pl.'s Opp'n 29–30 (citing cases). In those cases, the defendant is accused of introducing unnatural *ingredients* into a product labeled "natural." *See, e.g.*, *Petrosino*, 2018 U.S. Dist. LEXIS 55818, at *2 (alleging that defendant's products labeled "natural" "contain a combination of 22 synthetic and/or artificial ingredients");

---

[11] The consolidated class action complaint asserts, *inter alia*, violations of NYGBL §§ 349 and 350.

*Buonasera*, 208 F. Supp. 3d at 559 (claiming that defendant's "natural" products include synthetic and toxic ingredients); *Silva*, 2015 WL 5360022, at *1 (asserting that defendant's allegedly "natural" product "contains artificial ingredients, specifically caramel color and phosphoric acid"). Glyphosate, however, is not an "ingredient" added to defendant's products; rather, it is a substance introduced through the growing process. *See* Def.'s Reply 1, 4 n.2, 12–14. It is far more misleading to call a product "natural" when the defendant has introduced unnatural ingredients than it is to call a product "natural" when it contains trace amounts of a commonly used pesticide introduced early in the production process. *See also Podpeskar*, 2017 WL 6001845, at *5 (dismissing plaintiff's claims that she was deceived by yogurt labels containing the word "natural" because rather than alleging that an ingredient used in the products was unnatural, plaintiff contended that "several steps back in the food chain, there may have been something unnatural ingested by a cow").

Plaintiff contends that *In re General Mills* is an outlier among Second Circuit cases denying motions to dismiss NYGBL §§ 349 and 350 "natural" claims. *See* Pl.'s Opp'n 38 n.18. However, because many of these cases involve distinguishable claims regarding unnatural ingredients, I find the limited number of "natural" cases challenging the presence of glyphosate far more analogous. Plaintiff relies on two such cases, *Tran v. Sioux Honey Ass'n, Coop.*, 2018 U.S. Dist. LEXIS 146380, and *Organic Consumers Ass'n v. Gen. Mills, Inc.*, 2017 D.C. Super. LEXIS 4, to support her argument against dismissal. Leaving aside the fact that these cases are from other districts and are therefore not binding on this court, I find them both distinguishable from the matter at hand. In *Tran*, the court held that it could not determine as a matter of law whether a reasonable consumer would "interpret the word 'Pure' (and particularly, '100% pure')– to mean that the final product does not contain" trace amounts of glyphosate. *Tran*, 2018 U.S.

17

Dist. LEXIS 146380, at *14; *see also id.* at *13–15. I note first that the *Tran* decision was about the use of the word "pure," rather than "natural." *See id.* at *13 (relying on Merriam-Webster's definition of "pure" in rendering its decision). Further, the *Tran* court was particularly hesitant to dismiss plaintiff's claims because the defendant labeled its products "100% pure." *See id.* In this case, not only does Florida's Natural not assert that its products are "100% natural," but the word "natural" is only contained in the brand name. *See* Def.'s Mem. of Law 17. In *Organic Consumers*, while the court did decline to dismiss plaintiff's claim challenging defendant's "natural" label as false and misleading when the products contained glyphosate, the defendant there was accused of labeling its product as containing "100% Natural Whole Grain Oats." *See Organic Consumers*, 2017 D.C. Super. LEXIS 4, at *1.[12] In light of the factual differences between the claims in *Tran* and *Organic Consumers* and the claims before me, I find that a reasonable consumer would not be misled by defendant's product labels and that dismissal of plaintiff's NYGBL claims is therefore appropriate.

### C. Breach of Express Warranty

Axon alleges that Florida's Natural breached express warranties about its products because they "did not conform to Florida's Natural's affirmations and promises to be natural." Compl. ¶ 90. To state a claim for breach of an express warranty, "[a] plaintiff must allege 'an

---

[12] While *Organic Consumers* is at odds with *In re General Mills*, only *In re General Mills* dealt with alleged violations of NYGBL §§ 349 and 350. *See Organic Consumers Ass'n v. Gen. Mills, Inc.*, No. 2016 CA 006309 B, 2017 D.C. Super. LEXIS 11, at *1 (D.C. Super. Ct. Sept. 22, 2017) (denying defendant's motion for reconsideration and noting that *In re General Mills* "do[es] not . . . constitute binding authority in the District of Columbia or with regard to actions brought under the District of Columbia Consumer Protection Procedures Act").

Plaintiff alleges that *In re General Mills* is distinguishable from her case because "[t]here, the court found that the term '100% Natural' applied only to whole grain oats in the product," while "[i]n the present action, the term 'natural' . . . appl[ies] . . . to the entire Product." Pl.'s Opp'n 38 n.18. While the two cases are distinguishable on those grounds, the court disagrees with plaintiff's assumption that bearing the brand name "Florida's Natural" is akin to stating that the entire product is "100% Natural."

affirmation of fact or promise by the seller, the natural tendency of which was to induce the buyer to purchase and that the warranty was relied upon [to] the plaintiff's detriment.'" *Ault*, 2014 WL 1998235, at *6 (quoting *DiBartolo v. Abbott Labs.*, 914 F. Supp. 2d 601, 625 (S.D.N.Y.2012)). The New York Uniform Commercial Code states that "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty." N.Y. U.C.C. § 2-313(1)(a). However, "[g]eneralized statements by the defendant . . . do not support an express warranty claim if they are 'such that a reasonable consumer would not interpret the statement as a factual claim upon which he or she could rely.'" *Silva*, 2015 WL 5360022, at *10 (quoting *Hubbard v. Gen. Motors Corp.*, No. 95 Civ. 4362, 1996 WL 274018, at *6 (S.D.N.Y. May 22, 1996)); *see also* Pl.'s Opp'n 37 ("[A] breach of express warranty claim is governed by the same reasonable consumer standard as Plaintiff's [NYGBL] claims."). Because the court has concluded that a reasonable consumer would not interpret the "Florida's Natural" brand name as warranting that the products are free from trace amounts of glyphosate, plaintiff's breach of warranty claim is dismissed.

### D. Unjust Enrichment

Plaintiff brings a claim for unjust enrichment on the basis that "[a]s a result of Florida's Natural's deceptive, fraudulent, and misleading labeling, advertising, marketing, and sales of its Products, Florida's Natural was enriched, at the expense of Plaintiff Axon and the Class members." Compl. ¶ 97. Under New York law, an unjust enrichment claim "is available only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff." *Corsello v. Verizon New York, Inc.*, 967 N.E.2d 1177, 1185 (N.Y. 2012). "If the plaintiff is simply restating a contract or tort claim, then unjust enrichment is not available."

19

*Buonasera*, 208 F. Supp. 3d at 567. Axon's unjust enrichment claim merely duplicates her other causes of action based on the same alleged misrepresentations. It must therefore be dismissed.

## CONCLUSION

For the reasons stated in this opinion, defendant's motion to dismiss plaintiff's claims for failure to state a claim is granted in its entirety. Because plaintiff has requested leave to amend her complaint in the event that defendant's motion to dismiss is granted, *see* Pl.'s Opp'n 41 n.21, her claims are dismissed without prejudice. While the court believes that any amendment to this complaint would be futile, if plaintiff feels that she can cure the deficiencies identified by the court, she may file, within 10 days, a motion to amend along with her proposed amended complaint.

SO ORDERED.

_____/s/_____

Allyne R. Ross
United States District Judge

Dated: December 10, 2018
　　　　Brooklyn, New York